```
UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF RHODE ISLAND
- - - - - - - - - - - - - - - - - -x
In re:                              :

PAWTUXET VALLEY PRESCRIPTION &      :   BK No. 07-11767
SURGICAL CENTER, INC.                       Chapter 11
            Debtor
- - - - - - - - - - - - - - - - - -x
In re:                              :

SANDY BOTTOM PROPERTIES, LLC        :   BK No. 07-12699
            Debtor                          Chapter 11
- - - - - - - - - - - - - - - - - -x
```

**DECISION**

APPEARANCES:

    Andrew S. Richardson, Esq.
    Steven J. Boyajian, Esq.
    Attorney for Debtor, Pawtuxet Valley Prescription &
     Surgical Center, Inc.
    BOYAJIAN HARRINGTON & RICHARDSON
    182 Waterman Street
    Providence, Rhode Island 02906

    Peter J. Furness, Esq.
    Attorney for Debtor, Sandy Bottom Properties, LLC
    SINAPI FORMISANO & CO.
    100 Midway Place, Suite 1
    Cranston, Rhode Island 02920-5707

    Robert D. Wieck, Esq.
    Attorney for Creditor, Bank Rhode Island
    MacADAMS WIECK DeLUCA & GEMMA, INC.
    101 Dyer Street
    Providence, Rhode Island 02903

    Joseph P. Ferrucci, Esq.
    Christopher M. Mulhearn, Esq.
    Attorney for Creditor, AmerisourceBergen Drug Corporation
    FERRUCCI RUSSO PC
    55 Pine Street, 4th Floor
    Providence, Rhode Island 02903

**BEFORE ARTHUR N. VOTOLATO, United States Bankruptcy Judge**

BK Nos. 07-11767; 07-12699

## BACKGROUND

Before the Court are: (1) Pawtuxet Valley Prescription & Surgical Center, Inc.'s (PVP) Motion to continue the use of Bank Rhode Island's cash collateral; and (2) BankRI's Motion for relief from stay in the related case of Sandy Bottom Properties, LLC, seeking relief from stay as to 59-85 Sandy Bottom Road in Coventry, Rhode Island, the real estate where PVP operates its business. For purposes of our discussion, the same issue is dispositive of both motions – whether there is adequate protection of BankRI's interest in its collateral. With relief from stay, the Debtor must also establish that the real estate in question is necessary for an effective reorganization. *See* 11 U.S.C. §§ 362(d)(2) & (g). PVP argues that for purposes of the use of cash collateral, the Court should not consider whether PVP will likely reorganize, that the decision rests simply on whether the total value of BankRI's collateral exceeds the debt, and that as long as the Bank is over-secured the Court should allow PVP to continue to use BankRI's cash collateral, with no other questions asked. I disagree.

PVP filed its Chapter 11 case on September 4, 2007, and the first contested cash collateral hearing was commenced on the following day, September 5. Since that time, we have met on at least eight occasions to monitor cash collateral issues and to have

1

BK Nos. 07-11767; 07-12699

PVP report and answer questions about its operations. To say that this case has been excessively contentious and over litigated is a gross understatement. On January 28, 2008, we convened again for a hearing that was spread over six days and is the subject of this decision.

### **DISCUSSION**

Section 363(c)(2) of the Bankruptcy Code provides that: "The Trustee may not use sell or lease cash collateral ... unless (A) each entity that has an interest in such collateral consents; or (B) the court, after notice and hearing, authorizes such use ... in accordance with the provisions of this section." 11 U.S.C. § 363(c)(2). The section also provides that at the request of the secured creditor the Court "shall prohibit or condition such use [of cash collateral] ... as is necessary to provide adequate protection" of the secured creditor's interest. 11 U.S.C. § 363(e).

In addition, § 361 provides:

> When adequate protection is required under section 362, 363, or 364… such adequate protection may be provided by—
> 
> (1) requiring the trustee to make a cash payment or periodic cash payments to such entity, to the extent that the stay under section 362 of this title, use, sale, or lease under section 363 of this title, or any grant of a lien under section 364 of this title results in a decrease in the value of such entity's interest in such property;

2

BK Nos. 07-11767; 07-12699

>     (2) providing to such entity an additional or replacement lien to the extent that such stay, use, sale, lease, or grant results in a decrease in the value of such entity's interest in such property; or
>
>     (3) granting such other relief, other than entitling such entity to compensation allowable under section 503(b)(1) of this title as an administrative expense, as will result in the realization by such entity of the indubitable equivalent of such entity's interest in such property.

11 U.S.C. § 361. In considering whether the secured creditor is adequately protected, the Court must determine the value of the Bank's interest in the collateral and whether the Debtor's proposed use of cash collateral will impair that interest. *See In re Dynaco Corp.*, 162 B.R. 389, 394 (Bankr. D.N.H. 1993).

With regard to value, the legislative history to Section 361 is instructive:

> The section specifies four means of providing adequate protection. They are neither exclusive nor exhaustive. They all rely, however, on the value of the protected entity's interest in the property involved. The section does not specify how value is to be determined, nor does it specify when it is to be determined. These matters are left to case-by-case interpretation and development. It is expected that the courts will apply the concept in light of facts of each case and general equitable principles. It is not intended that the courts will develop a hard and fast rule that will apply in every case. The time and method of valuation is not specified precisely, in order to avoid that result. …
>
> Neither is it expected that the courts will construe the term value to mean, in every case, forced sale liquidation value or full going concern value. There is wide latitude between those two extremes. In any particular case, especially a reorganization case, the

3

BK Nos. 07-11767; 07-12699

> determination of which entity should be entitled to the difference between the going concern value and the liquidation value must be based on equitable considerations based on the facts of the case. …

S. Rep. No. 989, 95th Cong., 2d Sess., 54 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5840.  It is generally understood that adequate protection relates to maintaining the status quo for the period between filing the petition and before confirmation or rejection of the plan of reorganization, *U.S. v. Smithfield Estates, Inc. (In re Smithfield Estates, Inc.)*, 48 B.R. 910, 914 (Bankr. D.R.I. 1985), and as part of its analysis, the Court must monitor the Debtor's operations to determine whether the Bank is being exposed to a significant risk of harm on account of its collateral being depleted. *See Dynaco*, 162 B.R. at 394.  "Because courts are reluctant to terminate a reorganization at the outset of the case unless reorganization is clearly impossible, it is probable that the court will authorize the use of cash collateral if the debtor makes a credible showing of adequate protection.  Therefore, in many instances the secured creditor will prevail at a cash collateral hearing at the early stage of the chapter 11 case only if, as part of its case, it demonstrates that there is no realistic prospect of reorganization," *Commercial Bankruptcy Litigation*, §7:25.  If the reorganization hopes of the debtor are nothing more than wishful thinking, no useful purpose can be accomplished by allowing the debtor to use cash collateral.

4

BK Nos. 07-11767; 07-12699

> Since the equity holders and the general unsecured creditors are at the bottom of the "totem pole" of priority of claims against the assets of the enterprise, it is often tempting for those junior interests to don rose-colored glasses in evaluating the prospects for future operations and reorganization. It is the Court's task to scrutinize the data and projections supplied by the debtors with this danger in mind.  When the issue is raised early in the reorganization proceeding, the Court will generally permit the business operation to continue, at least to the point of plan formulation, if the debtors make a solid evidentiary showing to support their projections that survive the appropriate scrutiny.  It is always a difficult judgment call early in the case….

*Dynaco*, 162 B.R. 395.

On October 5, 2007, when BankRI enjoyed a significant equity cushion and was adequately protected, the Debtor was allowed the use of cash collateral on an interim basis, with frequent reporting and regular examination of its operations.  BankRI was owed approximately $2.5 Million and the parties stipulated to the market value of the real estate at $2.2 Million.  The Bank also has a first lien on machinery and equipment which was valued at $253,700 (at forced liquidation), and inventory and vehicles[1] at $125,000 (again at liquidation).  In October 2007, a major area of dispute was PVP's accounts receivable, with the Bank arguing that the

---

[1] BankRI expressed concern at the most recent hearing that it may not be secured as to any of PVP's vehicles, an argument that was not raised during the initial hearings. For purpose of our current analysis, very little weight is placed on the inventory and vehicles.

5

BK Nos. 07-11767; 07-12699

receivables were worthless and that most were over 90 days old. PVP said the receivables were worth in excess of $1,000,000. In the October 2007 interim order, giving no value to the receivables, and based on these values, the Bank was deemed to be adequately protected.

What has changed since October 2007?

(1) In December 2007, PVP brought on as a consultant, Alan Carey,[2] a pharmacy industry expert, to provide guidance during the Debtor's reorganization. Carey testified that two pill-packaging machines originally valued by PVP at $95,000 each are now virtually worthless because there is really no market for this used equipment. He also testified that: (a) PVP's acquisition of these machines for its long term care division was a poor decision because they did not provide a cost efficient way to distribute medications to long term care patients; (b) that PVP's decision to abandon its long term care division just prior to filing the petition was also very ill-advised because it squandered the prospect of receiving between $900,000 and $1,500,000 for the sale of this business. Carey also opined: (c) that PVP should, and will explore re-

---

[2] Carey was previously employed as a consultant in this (and other) matter(s) by PVP's largest unsecured creditor, AmerisourceBergen Drug Corporation.

BK Nos. 07-11767; 07-12699

entering the long-term care business as part of the reorganization; and (d) that PVP's operations were top heavy, especially as to executive salaries. In December 2007, Carey, while still employed by Amerisource, specifically recommended that PVP should reduce and reconfigure management, including reducing the $175,000 salary of CEO Mark Gilmore to $100,000, and requiring the President (Leo Blais) to be paid solely based on hours worked as a pharmacist, rather than his regular salary of $185,000. To date the Debtor has implemented neither of these recommendations, with no acceptable[3] explanation given as to why. The failure to implement these two specific recommendations places the Debtor's good faith in this reorganization in question. This Court's reaction to cuts made only to lower level employees can have had only a negative effect on rank and file morale at a critical time in the Debtor's existence, the decision to ignore Mr. Carey was very shortsighted by management, and reflects poorly on Mr. Carey's ability to achieve compliance by the Debtor with his recommendations.

(2) PVP's projections prior to enlisting Carey as a

---

[3] Instead of accepting its own expert's recommendations and tightening their belts as leaders in the cost-cutting department, top management looked only at lower level personnel to achieve the recommended cost savings.

7

BK Nos. 07-11767; 07-12699

consultant have never been achieved, and PVP has now abandoned those projections. In fact, PVP has posted losses every month since the September 2007 filing, and monthly sales in PVP's core business have declined from $414,000, as of the filing date, to $294,000 for December 2007.

(3)  Until its under-performance became obvious, PVP argued repeatedly and strenuously that sales of the drug Synagis would be the key to success in the reorganization, but that has not materialized and Synagis sales are off at least 27% from last year. In addition, Carey feels that Synagis is not a profitable item anyway, and noted that Synagis receivables generated to date barely equal what is owed to HD Smith, the manufacturer of the drug.

(4)  While Leo Blais insists that the poor Synagis figures are the result of negative press and publicity regarding the Chapter 11 filing, these are uncontrollable facts of life faced by most business debtors, and cannot affect the Court's evaluation of their performance.

(5)  Although specific numbers were not provided, Carey projects that the Debtor will continue to lose money in January 2008 and will not break even until sometime in March 2008. "Break-even," incidentally, does not include payment of

8

BK Nos. 07-11767; 07-12699

rent to Sandy Bottom or installment payments to BankRI, and according to Carey, for PVP to even reach "break-even," it will need to increase monthly sales from its current level of $293,000 to $593,000.  Carey has not explained in any detail how the Debtor will achieve this goal, but says that as part of becoming profitable the Debtor will reduce payroll costs from $230,000 per month to $150,000, and reduce general expenses to $75,000 per month.  Again, Carey provides no specifics as to how these numbers will be achieved by March 2008.

(6)   Carey believes PVP's accounts receivable are worth approximately $1,000,000 and that over the next 60 to 120 days the Debtor will collect all of the over 90 day receivables. His goal is to reduce the receivables to $600,000 and that all remaining receivables should be less than 90 days old. Under Carey's scenario, PVP will use at least $400,000 of (the Bank's) receivables to purchase additional inventory to grow sales.

During five-plus months in Chapter 11, the Debtor has not met any of its projections, while pre and post-petition management made a depressing series of poor business decisions, and that same management is now the Debtor's turn-around team.  The Debtor argues

9

BK Nos. 07-11767; 07-12699

that Mr. Carey can correct past mistakes and should be given the opportunity to do so, considering that his application to employ was just filed on January 18, 2008.  Amerisource, which in one breath claims to be an "undersecured creditor," and in the next acknowledges that it may be completely unsecured, supports the Debtor's request to use cash collateral.  The UST on behalf of unsecured creditors also supports the continued use of cash collateral.  Considering the assets of PVP only, it is clear that BankRI is under water and that Amerisource is unsecured.  If the real estate in the Sandy Bottom case is considered, BankRI still has an equity cushion, but Amerisource and other unsecured creditors of PVP receive no comfort from Sandy Bottom assets because they are not creditors of Sandy Bottom, and they have no security interest in Sandy Bottom assets.

It also appears that since October 2007, BankRI's collateral position has deteriorated by at least $190,000, based on Mr. Carey's opinion that the value of the pill-packaging machines is zero. Additionally, as PVP continues to operate, at least $400,000 of accounts receivable will be depleted and not replaced, all in what this Court sees as the still vague hope of PVP becoming profitable.

10

BK Nos. 07-11767; 07-12699

Given its consistently subpar performance to date, the significant equity cushion enjoyed by BankRI between both Chapter 11 estates is the Debtors' only redeeming feature.  In order to still support that conclusion, however, the receivables must now be included in the mix.  The real estate is still valued at fair market value because Mr. Carey is entitled to a brief period within which to show that a reasonable likelihood of reorganization is in prospect.  The Debtor is cautioned, however, that the continued passage of time, without such a showing, the more closely the Court will have to look at liquidation value of the collateral because, frankly, the Court does not share the same optimism over the Debtor and Mr. Carey's ability to stop the bleeding, as do Amerisource and the UST.

Although Mr. Carey has set very aggressive (although largely unsupported) goals for the Debtor, because the evidence still shows that BankRI still has an equity cushion even with an expected reduction in receivables, I will allow the continued use of cash collateral, to see if Carey can achieve the milestones he has established, for a period of approximately 60 days from the date the last hearing on cash collateral was concluded (February 5, 2008).  A continued hearing on cash collateral and relief from stay will be held on **April 16, 2008, at 11:00 a.m.**  Also, the Debtor is **ORDERED** to file and circulate a draft plan of reorganization by

11

BK Nos. 07-11767; 07-12699

**Monday, April 14, 2008**, and at the continued hearing, PVP shall report the <u>actual results</u> of its performance through March 31, 2008. The Debtor is forewarned that if it does not substantially achieve the projections of Mr. Carey, and if the prospect of reorganization has not significantly improved, the Debtor will be expected to show cause why an independent trustee should not be appointed for cause under 11 U.S.C. § 1104(a).

Dated at Providence, Rhode Island, this   10th   day of March, 2008.

_____
Arthur N. Votolato
U.S. Bankruptcy Judge

Entered on docket: 3/10/08

12